UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action |
| | ) | No. 08-CR-10193-DPW |
| JOFREE ACOSTA-SOTO | ) | |
| | ) | |

MEMORANDUM AND ORDER
October 21, 2009

Jofree Acosta-Soto and Hector Fernandez, the defendants in this matter, have been charged with conspiracy to distribute cocaine and possession of cocaine with intent to distribute. Acosta-Soto, joined by Fernandez, has moved to suppress evidence seized on June 14, 2008 during a warrantless entry and protective sweep of a residence at 15 Spring Street in Malden, Massachusetts.

## I. FINDINGS OF FACT

Following a full evidentiary hearing, and consideration of the submissions of the parties, I make the following findings of fact.

### A.  The Background

Beginning in at least October 2007, law enforcement personnel undertook an investigation of a suspected narcotics trafficking operation in Malden, Massachusetts.  The investigation incorporated information from local and national law enforcement officers and agents, confidential sources, public

records, telephone toll records, pen register, and tap and trace information.  Between November 2007 and March 2008, investigators conducted surveillance and trash pulls at 15 Spring Street in Malden, later determined to be defendant Acosta-Soto's residence.

On April 8, 2008, investigators executed search warrants at 15 Spring Street, Acosta-Soto's residence, and two other locations believed to be utilized by the defendants and the alleged drug organization.  During the execution of the warrant at 15 Spring Street, investigators discovered $5,000 in cash, materials believed to be used in drug packaging, and alleged drug ledgers.

Also in April 2008, a cooperating individual reported that Acosta-Soto's brother, Ismael Maldenado, who lived at 27 Holyoke Street in Malden and was also a target of the April 2008 search warrants, was the leader of a drug organization trafficking in multiple kilograms of cocaine in which he worked with Acosta-Soto.  The cooperating individual said that Maldenado used a black Infiniti to conduct drug sales.

Through Title III intercepts of April 2008 phone calls between Acosta-Soto and Maldenado, investigators learned that Acosta-Soto and Maldenado were preparing a transport vehicle to go to the Carolinas to pick up a large quantity of cocaine.  In response, the Drug Enforcement Agency and state and local law enforcement in the Carolinas set up a surveillance operation.  On May 1, 2008, a red Volvo XC90, previously seen at 27 Holyoke

Street, was stopped by North Carolina Patrol Officers who discovered two large, hidden compartments in the body of the vehicle.

**B.   The June 2008 Searches at 15 Spring Street**[1]

On or about June 12, 2008, DEA Task Force investigators in Massachusetts received information from New York law enforcement that Acosta-Soto and Maldenado expected to receive a multi-kilogram shipment of cocaine on the evening of June 13 or the morning of June 14.  That information was based on a New York based intercept in which officers heard Acosta-Soto discussing the transport and amount of cocaine from the Southeast or Carolinas to Massachusetts.  In response, Boston investigators initiated surveillance at several locations frequented by Maldenado and Acosta-Soto beginning on June 12, 2008.

On June 12 and 13, 2008, investigators observed Maldenado and Acosta-Soto enter and exit 27 Holyoke Street several times. On June 13, 2008, investigators watched Maldenado carry a briefcase from 27 Holyoke Street into a black Infiniti.

Between the late morning and early afternoon of June 14, 2008, investigators positioned themselves in various locations

---

[1] As will be apparent from these findings of fact, I largely credit the testimony of the law enforcement agents over the testimony of Acosta-Soto.  Specifically, I do not credit Acosta-Soto's account of the timing and chronology of the events on June 14, 2008.  There are, to be sure, certain inconsistencies – which I resolve in these findings – in the testimony of the investigators.  I find the basic and material testimony of the investigators to be largely consistent, however.

around 15 Spring Street.  Sergeant James Picardi was positioned

one street over.  Trooper Gregory DesFosses was positioned in a

driveway off a street parallel to Spring Street.  From his

position, Trooper DesFosses had a view of the front of 15 Spring

Street.  Detective Kenneth Kelley, positioned first in a parking

lot and then in an apartment building facing the side of 15

Spring Street, had a relatively unobstructed view of the driveway

and side door of 15 Spring Street.  Sometime after 1 p.m., DEA

Special Agent Jeffrey Commander arrived on Spring Street where,

from his vehicle, he had a long view of the driveway to 15 Spring

Street.  Detective Kelley and Special Agent Commander were in

communication by Nextel and radio throughout the surveillance.

At approximately 1 p.m., investigators observed the black

Infiniti operated by Maldenado pull up to and park in front of 15

Spring Street.  Investigators observed Acosta-Soto seated in the

front passenger seat.  Investigators watched Acosta-Soto exit the

Infiniti, walk to the open trunk of the vehicle and remove a

large package or container from the car and walk toward the rear

of 15 Spring Street.  Acosta-Soto was observed returning to the

Infiniti and thereafter, both Acosta-Soto and Maldenado were

observed driving to 27 Holyoke Street where they entered.

At approximately 2 p.m., investigators identified a vehicle

parked at the rear of 15 Spring Street as a silver or gray Volvo

XC90 with Pennsylvania registration.  A woman parked the Volvo in

the driveway, and with her female passengers, left 15 Spring

Street in Acosta-Soto's red Toyota Camry.

At 2:11 p.m., the black Infiniti returned to 15 Spring

Street and an individual later identified as defendant Hector

Fernandez was observed in front of 15 Spring Street holding two

packages. Detective Kelley then saw Acosta-Soto and Fernandez

coming in and out of the 15 Spring Street apartment, carrying

tools.  Detective Kelley observed the defendants removing the

rear seat of the Volvo and placing it in the backyard.  He saw

Acosta-Soto and Fernandez accessing what he believed were hidden

compartments in the Volvo.  Acosta-Soto entered the house and

then returned to the vehicle holding a white laundry bag.  After

Acosta-Soto filled the white bag with objects from the Volvo,

Fernandez carried the bag toward the side door of 15 Spring

Street.  Detective Kelley conveyed to other surveillance officers

his observations and his belief that the defendants were

accessing a hide, taking kilos of drugs out of the vehicle and

placing them in the bag.  When Detective Kelley relayed to

Special Agent Commander that it appeared that Acosta-Soto and

Fernandez had unloaded the hide, Special Agent Commander gave an

order to move in and arrest the defendants as they were walking

up the driveway.

Pursuant to that order, agents and officers moved down the

driveway and announced their presence, yelling "Police, Police."

Until the investigators made themselves known as they proceeded

toward the defendants, they had not been aware of the police surveillance.  As the investigators moved down the driveway and continued to announce their presence, Acosta-Soto and Fernandez ran inside 15 Spring Street and slammed the door.  Investigators knocked on the door, but received no response.  They then tried to turn the door handle, but it was locked.  Finally, Special Agent Commander broke down the door and entered 15 Spring Street. Approximately one minute passed between the order to move in and the defendants' arrest, roughly ten to twenty seconds of which consisted of investigators banging on the door, shouting "police," and trying the door handle before breaking the door down.

Once inside the residence, investigators observed Acosta-Soto and Fernandez standing in the living room.  The defendants were placed in custody and the investigators performed a protective sweep of the premises.  During that protective sweep, a Task Force Officer discovered, under a comforter on the bed in the bedroom, thirteen kilogram-sized packages of what was believed to be cocaine.

Approximately one and one-half hours passed between the time when the Volvo was observed arriving at the Spring Street location and the time the defendants were arrested.

In the very early morning of the following day, June 15, 2008, agents secured search warrants for 15 Spring Street, 27 Holyoke Street, and the Volvo XC90.  In the affidavit Special

Agent Commander prepared in support of the search warrant application, he stated that "agents observed a pile of kilogram style packages of what they believe to be cocaine sitting on top of a bed in a bedroom located within the apartment."

After securing warrants for 15 Spring Street and the Volvo XC90, investigators executed a full search of both.  During the search, investigators determined that the collection of kilogram-sized packages in the bedroom were, in fact, thirteen kilogram packages of cocaine.  In the Volvo, Agents discovered custom-built hidden components beneath the rear seating area.  The investigators determined that one compartment – presumably the one that they had observed being accessed the previous day – was empty; the other compartment contained twelve kilogram-sized packages containing cocaine.  The twelve packages found in the Volvo and the thirteen packages found in the apartment were similar in appearance.

## II.  CONCLUSIONS OF LAW

### A.  Warrantless Entry and Exigent Circumstances

The Fourth Amendment normally requires police to have both probable cause and a warrant before entering a person's home without the individual's consent.  *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995); *United States v. Beltran*, 917 F.2d 641, 642 (1st Cir. 1990) (*quoting Payton v. New York*, 445 U.S. 573, 590 (1980)).  Fourth Amendment jurisprudence provides that

in the absence of exigent circumstances the police may not,

without a warrant, cross the threshold of a home.  *Payton*, 445

U.S. at 590.   Thus, a warrantless entry into a suspect's

residence is "presumptively unreasonable[,]" but a warrantless

search may be permissible if there are exigent circumstances.

*United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005).

The government bears the burden of proving that exigent

circumstances support a recognized exception to the Fourth

Amendment warrant requirement.  *Tibolt*, 72 F.3d at 968-69.   "To

show exigent circumstances, the police must reasonably believe

that 'there is such a compelling necessity for immediate action

as will not brook the delay of obtaining a warrant.'"  *DeMayo v.*

*Nugent*, 517 F.3d 11, 15 (1st Cir. 2008) (*quoting Samboy*, 433 F.3d

at 158).   Legally sufficient exigent circumstances can be

provided by:

> (1) hot pursuit of a fleeing felon; (2)
> threatened destruction of evidence inside a
> residence before a warrant can be obtained;
> (3) a risk that the suspect may escape from
> the residence undetected; or (4) a threat,
> posed by a suspect, to the lives or safety of
> the public, the police officers, or to an
> occupant.

*United States v. Martins*, 413 F.3d 139, 146 (1st Cir. 2005).  *See*

*also Tibolt*, 72 F.3d at 969.   Proof of these circumstances must

be supported by "particularized, case-specific facts, not simply

generalized suppositions about the behavior of a particular class

of criminal suspects."  *DeMayo*, 517 F.3d at 15 (*quoting Samboy*,

-8-

433 F.3d at 158).   In reviewing the claimed exigency, a court's "inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." *Tibolt*, 72 F.3d at 969.

Based on the finding of facts, I conclude that the investigators' entry into 15 Spring Street was supported by exigent circumstances.

Upon becoming aware of the police presence, the defendants fled from the investigators and into the home.   Special Agent Commander testified to the reasonable law enforcement inference that, because the defendants knew that the investigators intended to arrest them and had run into the home, they would dispose of the drugs.   *See United States v. Santana*, 427 U.S. 38, 43 (1976) (finding that the investigators reasonably expected that the defendants, having become aware of the police presence, would destroy evidence).

At first blush, the facts here seem to fit squarely within the "hot pursuit" exigency that will justify warrantless entry. However, after the investigators pursued the defendants on the driveway and up to the door, they did not break down the door immediately and enter the premises; rather, the officers spent between ten and twenty seconds banging on the door and yelling at the defendants to open it.

In order to fall within the hot pursuit exception, the officers must be in "immediate" and "continuous" pursuit of the

suspect fleeing the scene of the crime.  *Welsh v. Wisconsin*, 466
U.S. 740, 753 (1984); *United States v. Salvador*, 740 F.2d 752,
758 n.5 (9th Cir. 1984).  In *O'Brien v. City of Grand Rapids*, the
Sixth Circuit found that where an officer chose not to pursue a
suspect after an initial confrontation and instead called for
backup and there was no concern about the destruction of
evidence, the hot pursuit exception did not apply to the entry
into the suspects' home six hours later.  *O'Brien v. City of
Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994).

Here, undertaking to "knock and announce" could be viewed as
militating against the contention that the investigators were in
hot pursuit.  However, I find that the pursuit by the officers,
despite the ten to twenty seconds of knocking and announcing
"police," was sufficiently immediate and continuous to fall
within the hot pursuit exception to the warrant requirement.  The
brief "knock and announce" exercise engaged in here appears to
have been a passing act of deference to another principle that
forms a part of the reasonableness inquiry under the Fourth
Amendment.  *See generally, Wilson v. Arkansas*, 514 U.S. 927, 929
(1995).  The government, however, should not be penalized for a
momentary pause in which to determine whether continued hot
pursuit would be necessary to secure evidence which might be
destroyed. Detective Kelley had just observed the defendants
engaged in criminal conduct and investigators immediately pursued
the defendants to effect their arrest.  The defendants, aware of

the police presence, rushed into the house and locked the door

while the investigators followed them.  Only ten to twenty

seconds later, investigators broke their way into the home.  I

find and conclude that the investigators' entry into the home on

this basis falls within the hot pursuit exception.

## B.    Manufactured Exigency

Exigent circumstances do not satisfy the Fourth Amendment

standards for permissible warrantless entry into a home if law

enforcement agents manufactured them by "unreasonably and

deliberately delaying or avoid[ing] obtaining the warrant."

*United States v. Rengifo*, 858 F.2d 800, 804 (1st Cir. 1988).

"[L]aw enforcement officers may not manipulate events to create

an emergency and bootstrap that invented emergency into a

justification for a warrantless entry of a person's home."

*Martins*, 413 F.3d at 148; *see United States v. Curzi*, 867 F.2d

36, 43 (1st Cir. 1989).

At the motion hearing, defendants pressed the contention

that, having probable cause to arrest the defendants when

investigators observed them dismantling the Volvo and unloading

the items in it, the investigators were somehow obligated to

secure a warrant before proceeding toward an arrest.  Acosta-

Soto, in particular, has argued that the law enforcement agents

were not permitted to sit on probable cause in order to create

exigent circumstances that would then justify warrantless entry

into the residence.

In determining whether exigent circumstances arose naturally during the course of an investigation or were manufactured by law enforcement, a court "must consider not only the motivation of the police in creating the exigency, but also the reasonableness and propriety of the investigative tactics that generated the exigency." *United States v. Maldonado*, 472 F.3d 388, 396 (5th Cir. 2006). This includes consideration of whether "(1) there was sufficient time secure a warrant; and (2) whether the exigency was created by unreasonable law enforcement tactics." *Id.*

Here, investigators likely had probable cause to arrest the Acosta-Soto and Fernandez when Kelley observed Acosta-Soto emptying objects from the Volvo into the laundry bag. Special Agent Commander issued his order to move in upon receiving that information from Kelley, who witnessed the defendant's activities around the Volvo.

Although a deliberate delay in applying for a warrant may preclude the government's reliance on an exigent circumstances justification for home entry, there is no rule that police officers must apply for a warrant the instant they reach the probable cause threshold.[2] *Beltran*, 917 F.2d at 643. Here, I

---

[2] I recognize that where officers expect that they may have to enter a home to arrest a suspect in the near future and they have adequate time to secure a warrant, they must do so. *United States v. Curzi*, 867 F.2d 36, 42 (1st Cir. 1989) (police had two hours in which they could have secured a warrant and the failure to do so precluded a finding of exigent circumstances). In

find and conclude that the investigators acted promptly upon having probable cause in their attempt to execute arrests while the defendants were still outside the residence.

I find and conclude that the exigent circumstances of hot pursuit and concern about the destruction of evidence were created by the defendants as they ran into 15 Spring Street, rather than by the investigators through manipulative generation of supporting circumstances.  The investigators were justified in pursuing the defendants into the home.

## C.    Protective Sweep

Once the investigators entered the premises located on exigent circumstances, they were permitted to conduct a protective sweep to ensure their safety.  *See Maryland v. Buie*, 494 U.S. 325, 334 (1990) (holding that in a protective sweep, "officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.") It was not beyond the bounds of a permissible protective sweep for a Task Force Officer to pull back a blanket, which he discovered was covering a pile of

---

*Curzi*, the suspects were already in their home before they became aware of the police presence and had been for approximately two hours.  *Id.* at 38.  Similarly, in *United States v. Beltran*, where officers had three to four hours before the arrest in which they could obtain a warrant, and they did not do so, the court found that the warrantless arrest inside the home violated the Fourth Amendment.  917 F.2d 641, 643-44 (1st Cir. 1990).

packages on the bed.  The packages appeared to contain cocaine.
The packages were discovered during a protective sweep in which a
Task Force Officer permissibly "moved a blanket covering a space
large enough for a person to hide."  *United States v. Winston*,
444 F.3d 115, 120 (1st Cir. 2006).  That movement put the
packages of cocaine in plain view and provided a proper predicate
for the search warrants.

### III.   CONCLUSION

For the foregoing reasons, I DENY Acosta-Soto's motion to
suppress (Doc. No. 21) in which Fernandez has joined.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE